SEALED

## AFFIDAVIT OF SPECIAL AGENT DANA FIANDACA

I, Dana Fiandaca, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the United States Immigration and Customs Enforcement ("ICE"), formerly the United States Immigration and Naturalization Service ("INS"), and have been so employed since June 1996. Among other duties, I am assigned to investigate the manufacture and sale of fraudulent Immigration and Naturalization Resident Alien Cards, Form I-551 (hereinafter "green cards"). From my training, I know that persons, usually aliens, manufacture and distribute counterfeit green cards and social security account number cards and other false identification documentation. The counterfeit documents are then distributed and sold to aliens who are illegally in the United States. I am familiar with the various criminal statutes which make it unlawful to manufacture and sell green cards, including Title 18, United States Code, Section 1028(a)(1)-(6) (producing identification and false identification documents); and Title 18, United States Code, Section 1426(b) (using and selling false naturalization, citizenship and registry documents).

2. This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and agents of ICE, as well as information provided to me by two Confidential Sources ("CS"). This affidavit is not intended to set forth all of the information that I and

other law enforcement personnel have learned during this investigation, but instead is submitted in order to establish probable cause for a criminal complaint against John Doe, a/k/a "Joel," charging him with violations of 18 U.S.C. Sections 1028(a)(1) and 1028(a)(2).

**BACKGROUND:**

3.   In January 2004, the Boston ICE Office received information from ICE Confidential Source Number SA-573-BO (hereinafter CS#1) regarding a Brazilian male known to CS#1 as "Joel," who was selling fraudulent green cards and social security account number cards in the Somerville, Massachusetts area.  CS#1 has previously furnished information to law enforcement, which has been verified to be reliable and accurate in fraudulent document investigations and other immigration violations.

4.   According to CS#1, "Joel" sells the aforementioned documents for approximately $100.00 per set (a set comprising one green card and one social security account number card).  CS#1 provided a cellular number of (781) 405-5391 as the way to contact "Joel" for the documents.

5.   On March 30, 2004, at approximately 12:57pm, ICE agents met ICE Confidential Source Number SA-564-BO (hereinafter CS#2) for the purpose of making a consensually monitored and recorded call to "Joel."  CS#2 has provided reliable information to ICE in the past, including information resulting in successful prosecutions of

individuals for providing false identification documents. ICE has provided CS#2 with an employment authorization card and has given him/her advanced parole to return to the country on occasion when CS#2 has left. ICE has paid CS#2 approximately $300.00 for assistance in past matters but has not provided payment in connection with this matter. Using a pretext, CS#2 made contact with "Joel" on March 30, 2004 at (781) 405-5391 and inquired about obtaining a fraudulent green card and social security account number card. According to CS#2, "Joel" agreed to accommodate the request, quoting CS#2 a price of $100.00 for the set. "Joel" also represented that he could provide same-day service, that is, deliver the completed documents the same day they were ordered. CS#2 agreed, and stated that he/she would be in touch. The call was then terminated. (This and other conversations between CS#2 and "Joel" took place in Portuguese.)

### THE DOCUMENT PURCHASE

6. On June 6, 2004, at approximately 12:38 p.m., your affiant met with CS#2 in Peabody, MA for the purpose of making a consensually monitored and recorded call to "Joel." CS#2 made contact with "Joel" at cellular number (781) 405-5391 and inquired about obtaining two (2) sets of fraudulent green cards and social security account number cards. According to CS#2, "Joel" agreed to accommodate the request, and based on the call, a meeting was scheduled for 11:00

a.m. on June 7, 2004 at 100 Main Street in Malden, MA. "Joel" lowered the document price per set from $100.00 to $90.00. "Joel" instructed CS#2 not to tell anyone where he/she was going because he did not want anyone knowing what he ("Joel") was doing. The call was then terminated.

7. On June 7, 2004, at approximately 10:00 a.m., ICE agents met with CS#2 in Revere, Massachusetts to prepare for the planned undercover meeting with "Joel" at 11:00 a.m. During the briefing, ICE agents performed an integrity search of CS#2 and his/her vehicle to ensure that CS#2 was not in possession of any fraudulent identification documents or other contraband. In addition, your affiant provided CS#2 with two (2) green card style photographs ("photos") of two different persons, fictitious biographical information for the two persons, and $180.00 of official funds (which was the fee for the two (2) sets of documents). CS#2 proceeded to write the two fictitious names and dates of birth on the back of each respective photo. Lastly, an electronic transmitter and recorder were placed on CS#2 to record the meeting.

8. At approximately 10:22 a.m., CS#2 made a consensually monitored and recorded call to "Joel" at the aforementioned cellular number to confirm the meeting. After CS#2 made contact with "Joel," he/she was able to confirm the meeting for 11:00 a.m. The call was then terminated.

9. At approximately 10:25 a.m., ICE agents arrived in the vicinity of 100 Main Street in Malden, Massachusetts and established stationary surveillance positions to await "Joel's" arrival.

10. At approximately 10:47 a.m., "Joel" was observed arriving at 100 Main Street operating his blue Chrysler Sebring, bearing Massachusetts Registration 6351 RK. He was observed parking his car on Main Street and entering 100 Main Street, proceeding out of view.

11. At approximately 10:58 a.m., CS#2, escorted by S/A Thomas Ohlson, was observed arriving in the vicinity of 100 Main Street. It should be noted that, according to CS#2, while en-route to 100 Main Street, he/she received an incoming call from "Joel" on the ICE undercover cellular phone. The number which appeared on the caller ID of the ICE cellular phone was (781) 324-2790. According to CS#2, "Joel" inquired as to CS#2's location and estimated time of arrival. CS#2 provided the requested information and terminated the call. According to Verizon telephone records, the current subscriber to (781) 324-2790 is an Adriana Uliano at 100 Main Street Apt. #7 in Malden, Massachusetts.

12. CS#2 parked his/her vehicle on Main Street, just past the entrance to building #100. CS#2 then exited the vehicle and proceeded on foot to the front door of 100 Main Street and placed a call to "Joel" at (781) 324-2790 to

advise "Joel" of his/her arrival. "Joel" stated that he would be right down. The call was then terminated.

13. At approximately 11:00 a.m., "Joel" was observed opening the front door of 100 Main Street (from inside the building) for CS#2. Both "Joel" and CS#2 were then observed entering 100 Main Street and proceeding out of view.

14. According to CS#2, "Joel" escorted him/her up to the third floor, and into Apartment #7. He then brought CS#2 into the second bedroom to the left, where CS#2 observed a white desktop computer, printer, scanner and typewriter next to one of the walls. CS#2 then provided "Joel" with the two green card style photos with the biographical information written on the backs.

15. According to CS#2, "Joel" used the computer to manufacture the green cards, scanning in the photos CS#2 had provided, and then typing in the biographical information. The green cards were then printed out on the computer printer and subsequently laminated. For the social security account number cards, however, "Joel" used a typewriter, which was next to the computer. He typed the biographical information onto blank social security account number cards, which were pre-printed and lying near the computer. Once the two (2) sets of documents were completed, "Joel" placed each set in a separate envelope and stapled each envelope shut. He then handed the two envelopes to CS#2. In exchange, CS#2 handed "Joel" the $180.00 of official funds.

According to CS#2, "Joel" returned $5.00 to him/her as a reward for placing the document order. After a brief conversation, CS#2 terminated the meeting and exited 100 Main Street, departing the area at approximately 11:56 a.m.

16. Shortly after the meeting, agents met with CS#2 for a debriefing, and to take custody of the documents. A closer examination of the documents revealed that the photos which appeared on the counterfeit green cards were the same photos your affiant provided to CS#2 earlier. The names on the two sets of documents purchased are Manoel MEIRELES and Cristina DA SILVA, the two fictitious names that CS#2 provided to "Joel."

### *EARLIER PURCHASES*

17. On three occasions before the June 7, 2004 transaction described above, CS#2 made purchases of other fraudulent sets of documents from "Joel." Those purchases were made on April 8, 2004, April 29, 2004, and May 10, 2004 in Everett and Malden, Massachusetts. On these occasions, CS#2 purchased a total of fourteen (14) fraudulent green cards and social security account number cards. CS#2, however, was not able to witness these documents being manufactured. He/she instead met on each occasion with "Joel" at a pre-designated area either other than, or outside of, 100 Main Street in Malden; placed the document order; and returned later (between one and two hours) to accept delivery of the completed documents and to pay "Joel"

for the documents. On each occasion CS#2 provided "Joel" with green card style photos and fictitious biographical information to use in making the cards, and on each occasion CS#2 thereafter received from "Joel" fraudulent green cards and social security account number cards incorporating these photos (in the case of the green cards) and this biographical information. On each occasion CS#2 wore a concealed recording device and transmitter, and on each occasion CS#2's conversations with "Joel" were recorded.

**CONCLUSION**

18. In sum, I have received a total of eighteen (18) documents from all of the aforementioned undercover purchases. I have reviewed the documents and have determined that they are counterfeit identification documents. A review of records of ICE and the Social Security Administration reveals that the green card alien registration numbers and social security account numbers appearing on the documents purchased are either invalid or belong to individuals other than those named on the documents.

19. Based on the foregoing, information, I believe probable cause exists to conclude that John Doe, a/k/a "Joel," on June 7, 2004, did, knowingly and without lawful authority produce false identification documents, and did knowingly and without lawful authority, transfer false identification documents, in violation of Title 18,

U.S.C., Sections 1028(a)(1) and 1028(a)(2).

_____
Dana Fiandaca
Special Agent
Bureau of Immigration and
 Customs Enforcement

Subscribed and sworn to before me this 18th day of June, 2004

_____
CHARLES B. S[...]
United States Magistrate Judge